**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

**UNITED STATES OF AMERICA,**

                    **Plaintiff,**

**v.**                                   **Case 2:21-cr-20011-MSN**

**KEVIN OLANDO OMBISI and**
**ERIC BERNARD RUSSELL, JR.,**
**a/k/a "Yo yo," a/k/a, "Big Bro,"**

                    **Defendants.**

---

**REPORT AND RECOMMENDATION ON DEFENDANT KEVIN OLANDO OMBISI**
**AND DEFENDANT ERIC BERNARD RUSSELL'S MOTIONS TO SUPPRESS**
**EVIDENCE OBTAINED FROM SUBJECT PREMISES 1, 3, 4, 5, 6, 7, AND 8**

---

Before the Court are the following motions, which have been referred to the United States

Magistrate Judge for Report and Recommendation (Docket Entry ("D.E.") #92):

- Defendant Eric Bernard Russell, Jr.'s ("Russell") Motion to Suppress Evidence Obtained Pursuant to Search Warrant for Residential Property **("Subject Premises 7")** located at 5215 Royal Sunset Court, Katy, TX 77493 (D.E. #81, #82);

- Russell's Motion to Suppress Evidence Obtained Pursuant to Search Warrant for Safety Deposit Box **("Subject Premises 8")** located at 22730 Morton Ranch Road, Deposit Box 0004028, Katy, TX 77449 (D.E. #83, #84);

- Russell's Motion to Suppress Evidence Obtained Pursuant to Search Warrant for Storage Unit **("Subject Premises 5")** located at 23155 Morton Ranch Road, Unit 2516, Katy, TX 77449.  (D.E. #85, #86).

In addition to these motions, Ombisi filed a Motion to Adopt and Conform Motions to

Suppress filed by Co-Defendant Russell (D.E. #91).  Therein, Ombisi sought to rely upon certain

legal arguments made by Russell but sought leave to file memoranda to delineate the factual

allegations that are specific to him. The Court granted Ombisi's motion. (D.E. #107). In his supplemental memoranda (D.E. #99, #100), Ombisi argues that evidence obtained from the following four additional locations be suppressed for the same reasons as articulated by Russell in his aforementioned motions:

- 24929 Katy Ranch Road, Apartment 15125, Katy, TX 77494 (**"Subject Premises 1**);

- 1660 Katy Gap, Apartment 12108, Katy, TX 77494 (**Subject Premises 3**);

- 23155 Morton Ranch Road, Unit 3716, Katy, TX 77449 (**Subject Premises 4**);

- 4855 West Fuqua Street, Apartment 508, Houston, TX 77045 (**Subject Premises 6**);

As Ombisi's memoranda seek the suppression of additional evidence, they have been construed as motions and have been referred to the United States Magistrate Judge for Report and Recommendation. (D.E. #127).

For the reasons set forth herein, Russell's requests for hearings pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), which are raised in his Motion to Suppress Evidence from Subject Premises 5 (D.E. #85) and Subject Premises 7 (D.E. #81) are DENIED.

It is RECOMMENDED that Russell's Motions to Suppress Evidence from Subject Premises 5 (D.E. #85), Subject Premises 7 (D.E. #81), and Subject Premises 8 (D.E. #83) be DENIED. It is further RECOMMENDED that Ombisi's requests to suppress evidence from Subject Premises 1 (D.E. #99), Subject Premises 3 (D.E. #99), Subject Premises 4 (D.E. #100), and Subject Premises 6 (D.E. #99) be DENIED.

2

I.      **Background**

      *A. Indictment and Superseding Indictment*

On February 2, 2021, a criminal complaint was issued charging Ombisi and Russell with drug-distribution and conspiracy offenses. (D.E. #1). On February 25, 2021, a grand jury of this Court returned a ten-count indictment ("Indictment") against Ombisi and Russell. (D.E. #8, #9). On October 28, 2021, a grand jury of this Court returned a ten-count superseding indictment ("Superseding Indictment") against Russell, Ombisi, and a third co-defendant—Winrose Wanjiru Ndichu, a/k/a "Rose," a/k/a "Shiru," a/k/a "Queen Shi" ("Ndichu"). (D.E. #53, #54, #56, #57).

The Superseding Indictment charges that Ombisi and Russell "participated in Darknet controlled substances trafficking activities using the moniker CARDINGMASTER." (Superseding Indictment ¶ 1). It alleges that, "[u]nder CARDINGMASTER, Ombisi and Russell conspired and attempted to, and did unlawfully distribute the Schedule II controlled substance methamphetamine, which was falsely represented to be Adderall, through the mail to be delivered by the Postal Service, in the Western District of Tennessee, and elsewhere, in exchange for Bitcoin cryptocurrency." (*Id.*) It further alleges that Ombisi and Russell unlawfully enriched themselves through this scheme, shielded their identities through the use of the CARDINGMASTER moniker and other business entities, and concealed the receipt of proceeds through the use of pseudo-anonymous Bitcoin cryptocurrency, cash, and various business and personal accounts. (*Id.* ¶¶ 2-3).

The Superseding Indictment charges Ombisi with the following: conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 (Count 1); unlawful distribution of controlled substances in violation of 21 U.S.C. § 841 (Counts 2-4); attempted unlawful distribution of controlled substances in violation of 21 U.S.C. § 846 (Count 5); sale of counterfeit

3

drugs in violation of 21 U.S.C. § 331(i)(3) and § 333(b)(8) (Count 6); conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1) & (h) (Count 7); and, mail fraud in violation of 18 U.S.C. § 1341 (Counts 8-10). It additionally charges Russell with conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) (Count 1) and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1) & (h) (Count 7).

### B.   Search Warrant Affidavit for Subject Premises 1-8

A single affidavit (the "Affidavit")[1] was submitted on February 9, 2021 in support of the applications for search warrants for Subject Premises 1-8. The Affidavit identifies the affiant as Special Agent Paul Cox of the Food and Drug Administration's Office of Criminal Investigations ("FDA-OCI").[2] (Aff. ¶ 2). Special Agent Cox states that the facts in the Affidavit are based upon his personal observations, his training and experience, and information obtained from other agents and witnesses. (*Id*. ¶ 3). He further states that the Drug Enforcement Administration ("DEA"), Homeland Security Investigations ("HSI"), and the United States Postal Inspection Service ("USPIS") were involved in this investigation. (*Id*. ¶ 10).

The investigation was initiated when law enforcement suspected that a seller with the moniker CARDINGMASTER was illegally distributing counterfeit Adderall, a Schedule II controlled substance under the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq*. ("CSA"), through a Darknet Marketplace[3] known as Empire Market and via the encrypted chat application

---

[1]  The Affidavit has been filed multiple times in the record in support of the various motions. (*See* D.E. #82, #84, #86, #99-1, #100-1). The search warrants along with the attachments thereto are also filed as exhibits in the docket entry that corresponds with each motion. (*Id*.)

[2]  The Affidavit additionally details Special Agent Cox's duties, prior law enforcement experience, and training, none of which are contested here. (*Id*. ¶ 2).

[3]  The Affidavit defines the "darknet" as "a portion of the internet that is not indexed by search engines and requires special software that encrypts and anonymizes internet traffic for both those browsing and

Wickr.[4]  (*Id*. ¶¶ 10, 11, 14).  Investigators further believed that the individual or individuals utilizing the CARDINGMASTER moniker had been operating on multiple Darknet Marketplaces since at least April 2019 and were responsible for more than 4,800 individual sales on Empire Market alone.  (*Id*. ¶ 11).

Between November 2019 and January 2021, undercover agents made approximately thirteen purchases of a product listed as Adderall from CARDINGMASTER without providing any prescriptions.  (*Id*. ¶ 14).  These purchases were made using Bitcoin ("BTC") cryptocurrency[5] and were shipped through the United States Postal Service's ("USPS") Priority Mail service.  (*Id*. ¶¶ 13-15).  Three of the purchases were made on the Empire Market, and approximately ten purchases were made by contacting CARDINGMASTER using a Wickr screenname. (*Id*. ¶ 14).

---

hosting websites on the darknet.  Because these protocols limit the ability of governments and law enforcement to track the usage and hosting of the sites, the darknet includes a large quantity of websites that exist primarily as marketplaces for illicit substances and services."  (*Id*. ¶ 5).  It defines the term "Darknet Marketplace" as "commercial websites that operate on darknets like Tor.  Tor and other darknets are networks of computers that utilize some of the same architecture of the Internet, but which provide greater anonymity and the obfuscation of user identities." (*Id*. ¶ 6).

[4]  The Affidavit explains that "Wickr" is an "encrypted communication application that allows individuals to communicate via text and voice and can be used on a cellular telephone."  (*Id*. ¶ 9).  Special Agent Cox states that "Wickr is used by individuals involved in the trafficking of counterfeit drugs because of the ability for senders of messages to set a self-destruct time for messages, as well as security features which notify senders of messages when parties to the conversation take a screenshot of messages."  (*Id*.)

[5]  The Affidavit defines "cryptocurrency" as a "type of virtual currency, that is a decentralized peer-to-peer, network-based medium of value or exchange."  (*Id*. ¶ 8).  Cryptocurrency is "used as a substitute for fiat currency (i.e. government-issued money, such as the U.S. dollar) to buy goods or services or [is] exchanged for fiat currency or other cryptocurrencies."  (*Id*.)  "Bitcoin" is a type of cryptocurrency that is acquired through "exchanges, BTC ATMs, or directly from other people" and "allows users to transfer funds more anonymously than is possible through traditional banking and financial systems."  (*Id*.)  Special Agent Cox states that, "[a]lthough cryptocurrencies, such as BTC, have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes, such as money laundering, and to purchase illegal goods and services."  (*Id*.)

Law enforcement agents received approximately eleven packages at the undercover address provided at the time of these purchases. (*Id*. ¶ 15). All of these packages entered the mail stream in either the San Antonio, Texas area or the Houston, Texas area and were destined for addresses in the Western District of Tennessee as well as to addresses in Kansas and Missouri. (*Id*.)

Two of the packages containing materials purchased from CARDINGMASTER were mailed via USPS on December 10, 2020 and January 27, 2021 respectively. (*Id*.). Law enforcement officers observed Ombisi mail these packages from the post office. (*Id*.) These packages were subsequently intercepted. (*Id*.) It was later determined by laboratory testing that, instead of containing the active pharmaceutical ingredient in Adderall, they contained methamphetamine, which is also a Schedule II controlled substance. (*Id*. ¶¶ 15, 16).

A review of the pre-printed postage found on all of the undercover purchases shows that they were purchased through a postage reseller ("Postage Reseller 1") operating under contract with USPS. (*Id*. ¶ 17). The email addresses listed on the account with Postage Reseller 1 were DNBACCESSORIESS@GMAIL.COM and DNBACCESSORIES@OUTLOOK.COM, and the two addresses listed on the account were located in Katy, Texas and San Antonio, Texas. (*Id*. ¶ 18). Further investigation into the records obtained from Postal Reseller 1 revealed that several larger shipments were being made in Priority Mail Medium Flat Rate Boxes from D & B Accessories, LLC in Katy, Texas to addresses associated with Ombisi in San Antonio, Texas. (*Id*. ¶ 19). Special Agent Cox states that it appeared that whoever received the packages in San Antonio, Texas may have divided them into smaller packages to send to purchasers. (*Id*. ¶ 19). These smaller packages were shipped using the same postage meter from San Antonio. (*Id*.) Further, at some point, the billing address for the Postage Reseller 1 account was updated to

24929 Katy Ranch Road, Katy, TX 77494, which is the same apartment complex as Subject

Premises 1, discussed, *infra*, Section I.B.i.

With respect to cryptocurrency transactions, law enforcement officers investigated seven

BTC wallet addresses provided by CARDINGMASTER that were used in seven of the

undercover purchases performed between January 22, 2020 and June 17, 2020.  (*Id*. ¶ 35).

Analysis of these showed that they were associated with clusters of BTC wallet addresses,

referred to in the Affidavit as CM Wallet 1 and CM Wallet 2.  (*Id*. ¶ 36).

Law enforcement officers further examined business records associated with a peer-to-

peer cryptocurrency exchange service ("P2P Exchanger 1") and found the following: (1) an

account with the username AmericanTrade registered in Ombisi's name with the telephone

number ending in -5180 and the email address DNBACCESORIES@OUTLOOK.COM; and, (2)

an account with the username AmericanTrade1 registered in Ombisi's name with the email

address DNBACCESSORIESS@GMAIL.COM. (*Id*. ¶ 37).  The AmericanTrade account

received BTC from CM Wallet 1 between October 4, 2019 and October 12, 2019.  (*Id*. ¶ 37).

The AmericanTrade1 account received BTC from approximately 174 transactions between

October 16, 2019 and April 20, 2020 from CM Wallet 1 and received BTC from approximately

105 transactions between March 12, 2020 and June 1, 2020 from CM Wallet 2.  (*Id*. ¶ 38).

Based upon evidence obtained from the initial steps of the investigation, law enforcement

officers obtained a search warrant for an iCloud account listed in the name of Kevin Ombisi with

the email address KEVINOMBISI@ICLOUD.COM ("Ombisi's iCloud Account").  (*Id*. ¶ 22).

Ombisi's iCloud account was associated with the telephone number ending in -5180.  (*Id*. ¶¶ 21-

22).  A review of these records discovered a photo bearing filename IMG_8055.PNG, which

appeared to be a screenshot of a chat communication with an individual stored in Ombisi's

iCloud Account under the name "Yoyo." (*Id*. ¶ 23). The metadata associated with this file

shows that it was last modified on or about March 21, 2020. (*Id*. ¶ 23). The photograph depicted

captured the following messages:

| Ombisi's iCloud Account | "need to have enough boxes on hand for 100+ orders" |
|---|---|
| "Yoyo" | "Go ahead and create a new login for usps. Make up a business name and I'll walk you through it. Give me a few business names and I'll tell you if it's good…" |
| "Yoyo" | "You need to hit up post offices at night cuz you know it takes damn near 2 weeks for boxes" |
| Ombisi's iCloud Account | "Ok bet let me get to the house rn." |

A review of Ombisi's iCloud Account revealed a contact stored under the name "Yoyo," which is associated with a telephone number ending in -0078.  (*Id*. ¶ 25).  A review of AT&T business records indicated that the telephone number ending in -0078 was registered to Russell with Subject Premises 7, discussed, *infra*, Section I.B.vi, listed as the address.  (*Id*. ¶ 26).

On May 27, 2020, a search warrant was issued for the iCloud account for the telephone number ending in -0078 ("Russell's iCloud Account").  (*Id*. ¶ 27).  A review of the records from Russell's iCloud Account revealed a photo bearing filename IMG_9585.HEIC. (*Id*. ¶ 28).  This was a photo of a computer screen depicting the phrase "2019 Empire Market" and containing a nine-word mnemonic phrase "needed to regain access to an Empire Market account in the event that a user cannot remember the account password and/or the private keys necessary to access the account."  (*Id*.)

Following this discovery, agents obtained a second search warrant for Ombisi's iCloud Account.  (*Id*. ¶ 29).  A review of these records discovered a photo bearing filename IMC_1752.PNG, which is a screenshot of a chat communication with an individual stored in Ombisi's iCloud Account under the name "Big Bro."  (*Id*. ¶ 30).  The metadata associated with this screenshot shows that this file was originally captured on or about September 23, 2020. (*Id*.).  This photo depicts a computer task bar with icons that agents recognized as being associated with Wickr and NordVPN, a virtual private network provider ("VPN") that encrypts and anonymizes data on the internet and allows for IP addresses to be masked.  (*Id*. ¶ 31 & n.3). The communication depicted in the photo is as follows:

| Sender: | Message: |
|---|---|
| "Big Bro" | "3rd floor appt 15320" |

| "Big Bro" | "He said he need you to create a new local Bitcoin account" |
| "Big Bro" | "He lost the trader that's why he hasn't been able to do deposits but he said he need them and he's weeks…" |

A review of the contact files stored within Ombisi's iCloud Account revealed a contact under the name "Big Bro" that was associated with the same telephone number ending in -0078 that had previously been identified as being registered to Russell with Subject Premises 7, discussed, *infra*, Section I.B.vi, as the address.  (*Id*. ¶¶ 32-33).

Based upon Special Agent Cox's training and experience, he states that he believes the communications between Ombisi and Russell contain discussions of "the creation of USPS shipping accounts in the name of fictitious accounts," "the procurement of shipping supplies, the creation of online accounts to be used to purchase postage, the best times of the day to go to USPS facilities in order to avoid detection by law enforcement, and the creation of accounts for the purposes of converting drug proceeds in the form of cryptocurrency into fiat currency."  (*Id*. ¶¶ 24, 34).

Finally, a review of business records associated with P2P Exchanger 1 indicated that the account assigned username AmericanTrade1, which was registered to Ombisi, was accessed on three distinct occasions on December 4, 2019 and on two distinct occasions on April 2, 2020 from an IP address servicing Subject Premises 7, which agents believe to be Russell's residence. (*Id*. ¶¶ 38-39, 82).

### i.     Subject Premises 1

Subject Premises 1 is an apartment located at 24929 Katy Ranch Road, Apartment 15125, Katy, Texas 77494.  (*Id*. ¶ 41).  This address is listed without the apartment number on the CARDINGMASTER account with Postage Reseller 1.  (*Id*. ¶ 20).

On July 9, 2020, USPIS inspectors conducted surveillance at Subject Premises 1 and observed a 2012 Volkswagen Jetta linked to Ombisi ("Ombisi's Jetta" or the "Jetta"), which is referred to in the Affidavit as Subject Premises 2, parked outside.  (*Id*. ¶¶ 42, 54).  They then observed a Black male who they recognized to be Ombisi exit the apartment, enter the Jetta, and depart the area.  (*Id*. ¶ 43).

The inspectors followed Ombisi as he drove directly to the Fleetwood Post Office in Houston, Texas.  (*Id*. ¶ 44).  They later reviewed video surveillance footage from the post office, which showed Ombisi walk inside "carrying a large white paper shopping bag and dump the contents, which appeared to be numerous small flat rate priority mail boxes, into the lobby parcel drop."  (*Id*.)  The inspectors "pulled the bin containing the outbound mail from the lobby drop box and found eleven (11) small flat rate boxes" using a return address for "D&B ACCESSORIES" in Katy, Texas, which had been found on previous parcels received from CARDINGMASTER.  (*Id*.)  There were no other small, flat-rate parcels in the outbound bin.  (*Id*. ¶ 45).

The inspectors retrieved one of these parcels (the "Fleetwood Parcel") and "noted the parcel had consistent package characteristics with previous buys from CARDINGMASTER" and was found to bear postage from the Postage Reseller 1 account used by CARDINGMASTER.  (*Id*.)  They subsequently obtained a search warrant for the Fleetwood Parcel.  (*Id*. ¶ 46).  A

search thereof "revealed the parcel to contain approximately 4.22 grams of pills in the form of tablets bearing markings consistent with previous undercover purchases of counterfeit Adderall from CARDINGMASTER, which were found to contain methamphetamine" and were found not to contain any "detectable amount of the active pharmaceutical ingredient found in Adderall . . . ." (*Id*. ¶ 47).

Law enforcement officers further reviewed Ombisi's iCloud Account records and determined that two IP addresses were servicing Subject Premises 1—the first between December 9, 2019 and April 30, 2020, and the second between September 10, 2020 and October 1, 2020. (*Id*. ¶¶ 48, 49) Devices assigned to these IP addresses accessed Ombisi's iCloud Account on approximately 428 occasions and 67 occasions, respectively. (*Id*.) The subscriber for these IP addresses was an individual referred to in the Affidavit as "WN." (*Id*.) WN is also listed as the emergency contact on Ombisi's storage unit, which is referred to in the Affidavit as Subject Premises 4, discussed, *infra*, Section I.B.iii. (*Id*.)

Additional business records produced by Postage Reseller 1 indicate that the billing address for the Postage Reseller 1 account known to be used by CARDINGMASTER had been updated to the same apartment complex as Subject Premises 1 but omitted the apartment number. (*Id*. ¶ 50).

Law enforcement officers also reviewed records from a Mastercard ending in -6063, which was associated with the CARDINGMASTER postage account. (*Id*. ¶ 51). This Mastercard had been used to purchase approximately $20,320 worth of postage between May 15, 2020 and October 28, 2020. (*Id*.) Business records from Bank of America, N.A. indicate that this Mastercard is associated with one of its accounts ending in -5306 in the name of Timewise

Commercial Cleaning, LLC (the "Timewise Cleaning Bank Account"). (*Id*.) Subject Premises 1

is listed as the address for the account and WN is listed as the Manager of Timewise Commercial

Cleaning, LLC. (*Id*.) WN is also listed as the emergency contact on Subject Premises 4,

discussed, *infra*, Section I.B.iii.

### ii.  *Subject Premises 3*

Subject Premises 3 is an apartment located at 1660 Katy Gap, Apartment 12108, Katy,

Texas 77494 where Ombisi "frequent[ly]" is known to "reside overnight." (*Id*. ¶ 60). Ombisi

was observed coming and going from Subject Premises 3 on several occasions in which Special

Agent Cox believes that he "appeared to be conducting drug trafficking activities." (*Id*. ¶ 66).

Specifically, the Affidavit details these activities as follows:

- On December 10, 2020, GPS tracking data showed that Ombisi's Jetta was at
  Subject Premises 3 at 05:18 and departed at 09:55. Ombisi's Jetta then travelled
  to Subject Premises 1 for a five-minute stop and then to Subject Premises 6,
  where Ombisi himself was observed by agents entering and exiting both the
  apartment and the vehicle. Ombisi's Jetta was then tracked to the Alameda
  Station post office, where USPIS inspectors observed him exit the Jetta carrying a
  "weighted bag" inside. USPIS inspectors obtained video surveillance from the
  interior of the post office that showed Ombisi "approaching the counter and
  depositing multiple parcels into the mail stream." Agents and inspectors
  recovered one of the parcels deposited by Ombisi, which was found to be bearing
  a label with the address provided by undercover agents from their purchase of
  thirty Adderall tablets from CARDINGMASTER that was placed earlier that day.
  A search of the parcel revealed approximately thirty tablets of a similar size,
  shape, and color with similar markings as those previously received by law
  enforcement conducting undercover purchases from CARDINGMASTER. A
  drug analysis determined that the tablets contained methamphetamine. (*Id*.)

- On January 7, 2021, GPS tracking data shows that Ombisi's Jetta was at Subject
  Premises from 00:32 until it departed at 07:50 a.m. Ombisi's Jetta travelled to
  Subject Premises 1, to Subject Premises 6, and finally to the Alameda Station post
  office at 13:36. USPS business records indicate that eight parcels bearing postage
  from the Postage Reseller 1 account used by CARDINGMASTER and bearing
  the return address found on previous parcels received from CARDINGMASTER
  entered the mail stream at the Alameda Station post office. (*Id*.)

13

- On January 15, 2021, GPS tracking data shows that Ombisi's Jetta was at Subject Premises 3 at 00:23 and departed at 10:32. Ombisi's Jetta travelled to Subject Premises 6 and then to the Alameda Station post office. USPS business records show that fourteen parcels bearing postage from the Postage Reseller 1 account known to be used by CARDINGMASTER and bearing the return address found on previous parcels received from CARDINGMASTER entered the mail stream at the Alameda Station post office. (*Id*.)

- On January 27, 2021, GPS tracking data shows that Ombisi's Jetta was at Subject Premises 3 at 06:29 and departed at 10:04. Ombisi's Jetta travelled to the vicinity of Subject Premises 4 and 5 and then to Subject Premises 6, where Ombisi himself was observed by agents. At approximately 11:21, undercover agents placed an order for twenty Adderall from CARDINGMASTER. At 13:17, USPIS inspectors observed Ombisi enter the Alameda Station post office. USPIS inspectors subsequently obtained video surveillance of him approaching the counter and depositing multiple parcels into the mail stream. Agents and inspectors photographed the labels of twelve of the deposited parcels and observed that one was found bearing a label with the address provided that day in the purchase made by undercover agents. (*Id*. ¶¶ 58-59).

Additionally, the address for Subject Premises 3 is listed on the lease for a storage unit identified as Subject Premises 4, discussed, *infra*, Section I.B.iii. (*Id*. ¶ 60). This storage unit is leased to Ombisi, lists the telephone number ending in -5180 that is associated with his iCloud Account, and lists the emergency contact as WN. (*Id*. ¶ 61).

A review of Comcast business records determined that an IP address and IPv6 addresses were servicing Subject Premises 3. (*Id*. ¶¶ 63, 65). A review of Apple business records demonstrates that Ombisi's iCloud Account was accessed by a device assigned the IP address on 371 distinct occasions and was accessed by a device assigned the IPv6 addresses on 1,445 distinct occasions. (*Id*. ¶¶ 62, 64).

14

### iii. Subject Premises 4

Subject Premises 4 is a storage unit located at 23155 Morton Ranch Road, Katy, Texas 77449.  (*Id*. ¶ 67).  Subject Premises 4 is 5' x 10' with space number 3716.  (*Id*. ¶ 68).  Subject Premises 4 is leased to Ombisi with the mailing address listed as Subject Premises 3, *see supra*, Section I.B.ii, with the telephone number listed ending in -5180, which is associated with Ombisi's iCloud Account, and with WN as the emergency contact.  (*Id*.)  Payments for Subject Premises 4 were made in September and October 2020 from the Timewise Cleaning Bank Account associated with CARDINGMASTER, Subject Premises 1, and WN.  (*Id*. ¶ 72).

Subject Premises 4 was accessed in excess of forty-five times between July 6, 2020 and January 27, 2021, including on the following dates: November 6, 2020; November 25, 2020; January 11, 2021; January 25, 2021; and, January 27, 2021.  (*Id*. ¶ 69).  GPS tracking information demonstrates that Ombisi's Jetta was located in the vicinity of Subject Premises 4 on these same dates.  (*Id*. ¶ 59).

On November 6 and November 25, GPS tracking data showed that Ombisi's Jetta was located later in the day at the Alameda Station post office.  (*Id*.)  On January 11 and January 25, GPS tracking data showed that Ombisi's Jetta was located later in the day at the Alameda Station post office, and USPS business records show that a total of twenty-four parcels entered the mail stream at the Alameda Station post office on those two dates.  (*Id*.)  These parcels bore postage purchased from the Postage Reseller 1 account used by CARDINGMASTER and bore the same return address found on previous parcels received from CARDINGMASTER.  (*Id*.)   Further, evidence showed that Ombisi mailed their undercover purchase from CARDINGMASTER on January 27, 2021.  (*See*, *supra*, Section I.B.ii).

Video surveillance footage from the storage facility also shows that, on February 1, 2021, Ombisi accessed the storage facility in which Subject Premises 4 and 5 are located. (*Id.* ¶¶ 59, 71). They observed a "visible bulge" in the front pocket of his sweatshirt. (*Id.* ¶ 71). He took the elevator from the first floor to the third floor, where Subject Premises 4 is located, exited the elevator, accessed a storage unit, removed a cardboard box from the unit, boarded the third-floor elevator carrying an open cardboard box under his arm, and departed the facility. (*Id.*) Law enforcement agents observed that the cardboard box bore the logo of Amazon.com but that, inside it, there appeared to be a USPS Priority Mail box. (*Id.*)

### iv.    *Subject Premises 5*

Subject Premises 5 is a storage unit located at 23155 Morton Ranch Road, Katy, Texas 77449. (*Id.* ¶ 67). Subject Premises 5 is 5' x 5' with space number 2516, and it is located one floor beneath Subject Premises 4. (*Id.* ¶ 73). Subject Premises 5 is leased to Russell with 2470 South Dairy Ashford, Houston, TX 77077 (the "South Dairy Ashford Address") listed as the mailing address and with the telephone number ending in -0078, which is associated with Russell's iCloud Account. (*Id.*) One of the emergency contacts listed for Subject Premises 5 is "AS," who is believed to be Russell's significant other or wife. (*Id.* ¶ 73 & n.4).

Law enforcement agents reviewed surveillance footage from January 26, 2021, and it showed Russell place two large boxes inside Subject Premises 5. (*Id.* ¶ 74). On the same date Russell was observed entering Subject Premises 5, he was believed to have closed another storage unit nine miles away that was rented in his name with the telephone number ending in -0078 and with the South Dairy Ashford Address. (*Id.* ¶¶ 74-75). Both Subject Premises 5 and the previously leased storage unit were paid for in cash. (*Id.* ¶¶ 75-76). Special Agent Cox

16

states that, based upon his training and experience, individuals involved in the trafficking of counterfeit drugs will utilize cash payments for two reasons: to conceal evidence from law enforcement; and, to avoid depositing large sums of cash obtained from illegal drug trafficking activities into bank accounts. (*Id*. ¶ 77).

### v. Subject Premises 6

Subject Premise 6 as an apartment located at 4855 W. Fuqua Street, Apartment 508, Houston, Texas 77045. (*Id*. ¶ 78). On numerous occasions, GPS tracking information indicates that Ombisi's Jetta was located in the vicinity of Subject Premises 6 immediately prior to Ombisi depositing packages at the Alameda Station post office. (*Id*. ¶¶ 59, 78). Ombisi longer than an hour—and often several hours—at Subject Premises 6 before continuing to the Alameda Station post office to mail his packages. (*Id*. ¶¶ 59, 78).

The packages mailed following Ombisi's trips to Subject Premises 6 were intercepted on various occasions and appeared to be affiliated with drug activity. (*Id*. ¶¶ 59, 78). Specifically, on four dates—January 7, 11, 15, and 25 of 2021, after Ombisi departed Subject Premises 6, USPS business records indicate that a total of forty-six parcels purchased using the Postage Reseller 1 account known to be used by CARDINGMASTER and bearing the same return address that was found on previous parcels received from CARDINGMASTER entered the mail stream at the Alameda Station post office. (*Id*. ¶ 59; *see*, *supra*, Sections I.B.ii & I.B.iii). Additionally, on January 27, 2021, law enforcement agents photographed the label of one of the parcels Ombisi deposited at the Alameda Station post office only minutes after departing from Subject Premises 6 and found it to contain an address provided by undercover agents during their

17

purchase on that same day. (*Id*.) Ombisi also went directly from Subject Premises 6 to the

Alameda Station post office on November 6, 2020 and November 25, 2020. (*Id*.)

### vi. *Subject Premises 7*

Subject Premises 7 is a home located at 5215 Royal Sunset Court, Katy, Texas 77493,

which is believed to be Russell's residence. (*Id*. ¶ 82). The telephone number ending in -0078

registered to Russell lists Subject Premises 7 as his address. (*Id*. ¶ 26).

Records from Russell's iCloud Account and Comcast Communications indicate that a

total of seventeen IP and IPv6 addresses were servicing the premises—one from August 2, 2019

until December 18, 2020 that was accessed by a device on 9,644 distinct occasions, and sixteen

others from September 27, 2019 until December 14, 2020. (*Id*. ¶¶ 84-86). As discussed, *supra*,

Section I.B, P2P Exchanger 1 business records were accessed by the AmericanTrade1 account

on five occasions by the same device that was assigned to Subject Premises 7's IP addresses and

that was used to access Russell's iCloud Account on 9,644 occasions. (*Id*. ¶ 87).

On January 2, 2021, investigators believe that Ombisi met Russell in the area of Subject

Premises 7. (*Id*. ¶ 83). Before the meeting, Ombisi was in the vicinity of a bank at 14:35 that

afternoon. (*Id*.) At 15:25, Ombisi's Jetta was located in the vicinity of a playground

approximately 152 meters to the west of Subject Premises 7; at the same time, video surveillance

footage showed a white Acura RDX matching the description of a vehicle registered to Russell

depart the garage of Subject Premises 7. (*Id*.) At approximately 15:37 p.m., GPS tracking

information indicated that Ombisi's Jetta departed the area of the playground adjacent to Subject

Premises 7. (*Id*.) At the same time, location information from Russell's cellular phone indicated

that the device was located approximately 88 meters to the south of Subject Premises 7 and

approximately 121 meters southeast of the playground adjacent to Subject Premises 7.  (*Id*.)  At approximately 15:39, video from a surveillance camera installed in the area of Subject Premises 7 shows the white Acura RDX returning to Subject Premises 7 from the south and parking in the garage.  (*Id*.)  At approximately 15:53, location information related to Russell's cellular phone indicated that the device was located in the vicinity of Subject Premises 7 with an accuracy radius of less than six hundred meters.  (*Id*.)

### vii.  Subject Premises 8

Subject Premises 8 is a Regions Bank safety deposit box with an account number ending in -0286.  (*Id*. ¶ 88).  Subject Premises 8 was registered to Russell and was associated with the telephone number ending in -0078 that was registered to Russell.  (*Id*. ¶¶ 26, 88-89).  Subject Premises 8 was registered with the address for Subject Premises 7, which is believed to be Russell's home.  (*Id*. ¶¶ 82, 88).  Subject Premises 8 was opened on or about February 21, 2020, which was a few days after he opened two Regions Bank accounts (ending in -2060 and -2079) ("Russell's Regions Bank Accounts") on or about February 18, 2020.  (*Id*. ¶ 89).  The Regions Bank accounts listed Eric Russell as the co-owner with AS, who is believed to be his wife or significant other, the address as Subject Premises 7, the telephone number ending in -0078 that was registered to Russell, and the email address as ericrusselljr@hotmail.com.  (*Id*. ¶ 89 & n.4)

Subject Premises 8 measures "5 x 10," which is the second largest size offered at Regions Bank.  (*Id*. ¶ 90).  This size is not complementary and is not the default option for Regions Bank accounts.  (*Id*.)  Instead, the annual rental fee for this storage option is $112.00.  (*Id*.)  Regions Bank personnel advised that its facility "offers at least one smaller size of box which would accommodate standard size documents, without folding the documents, leading agents to believe,

based on experience and training, that this size box was rented in order to accommodate a volume of items in excess of a small number of documents." (*Id.*) Special Agent Cox states that, based upon his training and experience, this size safety deposit box is not typical for storing only smaller items, such as passports and birth certificates. (*Id.*)

The Affidavit states that the review of Russell's Regions Bank Accounts includes activity that Special Agent Cox believed to be suspicious. (*Id.* ¶ 91.) He states that this suspicious activity is also "seen in other accounts controlled by" Russell and Ombisi. (*Id.*) First, the records reflect that Russell wrote checks to himself in amounts ranging from $4,000.00 to $9,850.00 and deposited them at Regions Bank. (*Id.*) Second, the records reflect that three person-to-person transfers totaling $70,000.00 were made from other accounts to his Regions Bank accounts in February 2020. (*Id.*) Approximately $20,000.00 of this amount was transferred from other accounts linked to Russell, and approximately $50,000.00 of this amount was transferred from a Bank of America account ending in -5657, which was registered in the names of Russell and "AS" and was open from approximately April 4, 2019 to March 11, 2020. (*Id.*)

The Affidavit sets forth that a review of location information related to Russell's telephone number indicates that, on thirteen occasions between July 9, 2020 and January 22, 2021, his telephone was located in the vicinity of Subject Premises 8 between Monday and Friday and between the hours of 09:00 and 17:00. (*Id.* ¶ 92.) On February 5, 2020, Regions Bank employees confirmed that Russell had been observed accessing the area of Subject Premises 8. (*Id.* ¶ 93.)[6] Regions Bank employees also confirmed that they are familiar with

---

[6] The Affidavit further explains that, "[d]ue to an abnormality in the electronic biometric logging system," Russell's access to Subject Premises 8 was not recorded. (*Id.* ¶ 93). Additionally, while all

Russell and that he is a "good customer . . . with whom they check in approximately monthly to inquire about his satisfaction with the services at the branch and whether he is interested in additional services." (*Id.* ¶ 93).

As it pertains to Subject Premises 8, Special Agent Cox states that, based upon his training and experience, individuals involved in the trafficking of counterfeit drugs using the darknet and in exchange for cryptocurrency "often handle large amounts of fiat currency, or other valuable items, which they receive in exchange for the cryptocurrency which they have received as proceeds of illegal drug sales." (*Id.* ¶ 94). He further explains that "[i]ndividuals involved in digital currency, including those who launder funds by using digital currency, use a variety of digital devices, such as phones and computers. These individuals also use multiple digital devices in order to maintain anonymity and to compartmentalize communication, or use encrypted forms of communication in speaking with criminal associates." (*Id.* ¶ 95). Additionally, "those who use digital currency may store their 'recovery seed' or 'private keys' on digital devices. This also includes personal digital devices that the individual carries on their person." (*Id.*) He explains that "accessing the darknet can occur by USB or flash-drive device" and that "individuals who have such valuable information store this information separate and away from their routine drug operations such that it is safe from theft and/or law enforcement and compartmentalized." (*Id.*)

---

registered users of safety deposit boxes were required to be enrolled in the biometric access system, records reflect that AS was not. (*Id.* ¶ 93). Regions Bank personnel advised that, while it is in violation of Regions Bank practice, branch personnel are able to manually grant customers access to the safety deposit boxes without using the biometric access system. (*Id.* ¶ 93).

II.      Analysis

A.   *Whether Russell is entitled to Franks hearings*

As a threshold issue, in his Motions to Suppress Evidence obtained from Subject

Premises 5 and 7, Russell requests that evidentiary hearings be held pursuant to *Franks v.*

*Delaware*, 438 U.S. 154 (1978).  In *Franks*, the Court began with the premise that an affidavit

supporting a search warrant is presumed to be valid.  *Id*. at 171.  Generally, the "review of the

sufficiency of the evidence supporting probable cause is limited to the information presented in

the four corners of the affidavit."  *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016)

(citing *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009)).  However, if the defendant

makes a substantial preliminary showing that a false statement knowingly and intentionally, or

with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if

the allegedly false statement is necessary to the finding of probable cause, the Fourth

Amendment requires that a hearing be held at the defendant's request.  *Franks*, 438 U.S. at 155-

56.  The challenger's attack must be more than conclusory, and it should point out specifically

the portion of the warrant affidavit that is claimed to be false.  *Id*. at 171.  Allegations of

negligence or innocent mistake are insufficient to warrant a *Franks* hearing.  *Id*.

i.      *Subject Premises 5*

With respect to the evidence presented to obtain a search warrant for Premises 5, the

Affidavit states as follows: (1) that Russell provided the South Dairy Ashford Address for

purposes of leasing Subject Premises 5 and another storage unit (Aff. ¶¶ 73, 75; D.E. #86-1 at

PageID 562); and, (2) that, based upon Special Agent Cox's training and experience,

"individuals involved in the trafficking of counterfeit drugs who are wishing to conceal their

activities from law enforcement will at times provide addresses which are not accurate in order to hinder law enforcement's ability to associate these facilities with their activity." (Aff. ¶ 77).

Russell argues that the South Dairy Ashford Address is not "inaccurate" but is an address that he uses for "a variety of legitimate business reasons, including filings with the Texas Secretary of State." (D.E. #85 at PageID 489-490 & Exh. 2, D.E. #86-1, at PageID 549-552, 556-57, 559-61, 575, 581, 584). Russell additionally argues that the Affidavit omits the mailbox number (#237) for the South Dairy Ashford Address that he provided to lease Subject Premises 5 (D.E. #86-1 at PageID 568) and that the fact that he utilized his real name when registering to be a tenant at Subject Premises 5 (*see id.*) further undermines Special Agent Cox's assertion that Russell was attempting to avoid detection.

The Government responds that the Court need not reach a conclusion about the accuracy of Russell's address, and that no *Franks* hearing is required, for two reasons: (1) Russell has not made a reasonable showing that the warrant contains a materially false statement, much less that it was made intentionally and knowingly or with reckless disregard for the truth; and, (2) that Russell's allegedly false address was not necessary for a finding of probable cause. (D.E. #119 at PageID 1835).

Upon review, it is RECOMMENDED that Russell has failed to make a substantial preliminary showing that Special Agent Cox knowingly and intentionally or with reckless disregard for the truth stated in the Affidavit that the South Dairy Ashford Address is not accurate. It appears from the Affidavit that he believed that Russell's home was Subject Premises 7 (Aff. ¶ 82). Additionally, the driver's license Russell provided to lease Subject Premises 5 lists an entirely different Houston, TX address. (*See* D.E. #86-1 at PageID 569; *see*

*also* D.E. #85 at PageID 490).  Thus, it appears to be an innocent mistake, and, at most, it could

be argued to be negligent mistake because the records from the Texas Secretary of State are

publicly accessible and could have been obtained by Special Agent Cox.  Accordingly, Russell's

motion for an evidentiary hearing pursuant to *Franks* is DENIED.

### ii.    *Subject Premises 7*

With respect to the evidence presented to obtain a search warrant for Premises 7, Russell

argues that the Affidavit omits information regarding the ping radius of his phone.  (D.E. #81 at

PageID 344).  Russell argues that this information was presented in the affidavit to obtain a

search warrant (21-SW-051) for the geolocation data of Russell's phone ending in -0078

("Geolocation Affidavit").  (*See* D.E. #81 at 344-45; D.E. #88-7).  A review of the Geolocation

Affidavit shows that it details Ombisi and Russell meeting at a playground near Subject Premises

7.[7]  The Geolocation Affidavit includes information from GPS tracking data, cellular phone

location data,[8] and video surveillance to detail a meeting between Ombisi and Russell on a

playground near Subject Premises 7.[9]

> In the interest of clarity, it is worth noting that the accuracy radius of this location
> for the Target Cell Phone is listed at 2,500 meters.  That said, based on the
> accuracy radius of the location associated with the Target Cell Phone previously

---

[7]  The Geolocation Affidavit does not identify this location as Subject Premises 7; however, it provides
the address of 5215 Royal Sunset Court, Katy, Texas 77493 (*see* D.E. #88-7 at ¶¶ 86-91), which is
identified in this Affidavit as Subject Premises 7.

[8] The Geolocation Affidavit does not identify the cellular phone from which they are obtaining location
data as Russell's; instead, it is referred to as the "Target Cell Phone."  (D.E. #88-7 at ¶¶ 81, 89, 91).
However, the Target Cell Phone number ending in -0078 is the same as the cell phone identified as being
registered to Russell in this Affidavit.  (D.E. #88-7 at Attachment A, PageID 772; D.E. #82 ¶ 33).

[9]  Both the Geolocation Affidavit and one portion of this Affidavit state that this meeting occurred on
January 7, 2021 and provide the same precise details of it.  (D.E. #82 ¶ 59 & D.E. #88-7 at ¶¶ 77, 84-91);
however, another portion of this Affidavit states that the meeting occurred on January 2, 2021 (D.E. #82
at ¶ 83).  The Government acknowledges this inconsistency and states that it appears that these references
all pertain to the same meeting.  (D.E. #119 at PageID 1837 n.2).

observed in this area of Katy, TX, agents['] training and experience, the return of the vehicle registered in Russell's name from the direction of this location, and the location and accuracy of the subsequent location information for the Target Cellphone [sic] it is believed that this location is approximately accurate for the Target Cell Phone at this date and time.

(D.E. #81 at PageID 345 n.6; DE #88-7 at ¶ 89, n.8).

The Government responds that no *Franks* hearing is required for three reasons: (1) the statements in the Affidavit are true; and, (2) Russell has not demonstrated that Special Agent Cox intentionally, knowingly, or with reckless disregard for the truth omitted the ping-radius information, particularly because he states in the Geolocation Affidavit that he believed that the location information regarding the suspected January 7, 2021 meeting was "approximately accurate." (*See* D.E. #119 at PageID 1837; D.E. #88-7 at ¶ 89, n.8).

Upon review, it is RECOMMENDED that that Russell has failed to make a substantial preliminary showing that Special Agent Cox knowingly and intentionally or with reckless disregard for the truth omitted the information regarding the ping radius from the Affidavit. Specifically, he states in the Geolocation Affidavit that it is believed that this location is approximately accurate for the Target Cell Phone at this date and time. (DE #88-7 at ¶ 89, n.8). This demonstrates that he did not believe that any statement in the Affidavit was false and that, at most, it was an innocent or negligent mistake not to include the information in the Geolocation Warrant regarding the accuracy radius. Accordingly, Russell's motion for an evidentiary hearing pursuant to *Franks* is DENIED.

### B.  Whether the Affidavit establishes probable cause to search the Subject Premises

The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted); *see also United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citation omitted) (explaining that "[s]earch warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny").

"The critical element of a reasonable search is . . . that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought." *Zurcher v. The Stanford Daily*, 436 U.S. 547, 556 (1978) (internal quotation marks omitted). This is typically referred to as the "nexus" between the place to be searched and the evidence desired to be found. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2003).

Although reasonable minds may frequently differ on the question of whether the affidavit establishes probable cause, reviewing courts should afford the issuing magistrate's determination "great deference," *United States v. Leon*, 468 U.S. 897, 914 (1984) (citation omitted), "an issuing magistrate's decision should only be reversed if it was arbitrarily exercised," *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (citing *United States v. Swihart*, 554 F.2d 264, 270 (6th Cir. 1977)).

Even if a search warrant is ultimately determined to have been issued without probable cause, suppression of the evidence is not the automatic remedy. *United States v. Leon*, 468 U.S.

at 913-21.  If officers were acting in objectively reasonable reliance on a search warrant that is

subsequently invalidated, the good-faith exception to the exclusionary rule applies such that the

evidence may be introduced despite the magistrate's error.  *Id*.; *see also United States v.*

*Laughton*, 409 F.3d 744, 748-49 (6th Cir. 2005); *United States v. Savoca*, 761 F.2d 292, 295-98

(6th Cir. 1985).

The *Leon* court identified four circumstances when officers' reliance upon a search

warrant is not objectively reasonable.  *Laughton*, 409 F.3d at 748 (citations omitted).  The first

circumstance is when the warrant is issued on the basis of an affidavit that the affiant knows, or

is reckless in not knowing, contains false information, the good-faith exception does not apply.

*Id.; see United States v. Abernathy*, 843 F.3d 243, 257-28 (6th Cir. 2016) (citing cases).

The second is when the issuing magistrate judge abandons his or her neutral and detached

role and "serves as a rubber stamp for police activities."  *Laughton*, 409 F.3d at 748.  Examples

of such conduct are if the magistrate fails to read and review it or relies upon unsworn testimony.

*See, e.g.*, *United States v. Frazier*, 423 F.3d 526, 537 (6th Cir. 2005).  The burden rests with the

defendant to prove that the magistrate acted as a "rubber stamp."  *Id*. (citing *United States v.*

*Rodrigues-Suazo*, 346 F.3d 637, 649 (6t Cir. 2003)).

The third is when the affidavit is "so lacking in any indicia of probable cause that a belief

in its existence is objectively unreasonable."  *Laughton*, 409 F.3d at 748.  This is also known as a

"bare bones" affidavit, and it is commonly defined as one that states only "'suspicious, beliefs, or

conclusions, without providing some underlying factual circumstances regarding veracity,

reliability, and basis of knowledge.'"  *Id*. (citing *United States v. Weaver*, 99 F3d 1372, 1378

(6th Cir. 1996)).  Put otherwise, it is a "conclusory affidavit" that asserts only the affiant's belief

that probable cause existed and is completely devoid of facts to support that conclusion. *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (citing *United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000); *Carpenter*, 360 F.3d at 595-96).

The fourth is when the warrant is "so facially deficient that it cannot reasonably be presumed to be valid." *Laughton*, 409 F.3d at 748 (citations omitted). Examples of facially deficient warrants include ones that fail to particularize the place to be searched or the items to be seized. *Leon*, 468 U.S. at 923. If a warrant is facially deficient, even a cursory reading of the warrant—and perhaps just a simple glance—would have revealed "'a glaring deficiency that any reasonable police officer would have known was constitutionally fatal.'" *United States v. Linda Roos*, No. 12-09-ART, 2013 WL 1136629, at *3 (E.D. Ky. Mar. 18, 2013) (citing *Groh v. Ramirez*, 540 U.S. 551, 564 (2004)).

### i.    *Subject Premises Associated with Ombisi*

#### a.    *Subject Premises 1*

With respect to Subject Premises 1, Ombisi relies upon Russell's general argument that a nexus must exist between the place searched and the evidence sought; however, Ombisi does not articulate either why he believes that no such nexus existed with Subject Premises 1 or why the issuing magistrate judge's finding that it did was arbitrary.

After reviewing the Affidavit, it sets forth that Ombisi was observed leaving Subject Premises 1 and going directly to the Fleetwood Post Office, where he shipped the Fleetwood Parcel. The Fleetwood Parcel was subsequently intercepted and found to be packaged consistently with previous purchases from CARDINGMASTER, and it was found to bear postage purchased using CARDINGMASTER's Postage Reseller 1 account. It was further

28

found to contain 4.22 grams of tablets bearing markings consistent with previous undercover purchases from CARDINGMASTER.  The pills were determined not to contain Adderall but instead to contain methamphetamine.  In addition, Ombisi mailed ten other parcels on that date with the same return address associated with other undercover purchases from CARDINGMASTER.  Additionally, Subject Premises 1 is listed, without the apartment number, as the billing address for CARDINGMASTER.  It is also listed on financial records as a means of payment associated with CARDINGMASTER.

Absent any specific argument as to why these connections between Subject Premises 1 and Ombisi's suspected drug trafficking activities are insufficient for the issuing magistrate judge to have found that that the requisite nexus existed, it is RECOMMENDED that the search warrant for the search thereof was supported by probable cause and not violative of the Fourth Amendment.

### b.  Subject Premises 3

With respect to Subject Premises 3, Ombisi relies upon *Brown* and argues that the Affidavit is "improper and overly vague" because it states that Ombisi "was observed coming and going from Subject Premises 3 on several occasions in which he appeared to be conducting drug trafficking activities" but contains "no description whatsoever of these alleged activities" (D.E. 99 at PageID 1362 & Aff. ¶ 66); *Brown*, 828 F.3d at 381; however, a review of other portions of the Affidavit show that these details are provided.  (Aff. ¶ 59 & *supra*, Section I.b.ii)

Specifically, GPS tracking data shows that Ombisi's Jetta was located at various locations, including Subject Premises 1, earlier in the day on six dates when he made shipments from the Alameda Station post office.  On four of these dates, as also set forth, *supra*, Section

29

I.B.ii, the investigation yielded further specifics about these mailings.  Specifically, on December 10, 2020, Ombisi mailed thirty tablets of methamphetamine to undercover agents who made a purchase from CARDINGMASTER.  On January 7 and January 15, 2021, Ombisi mailed a total of twenty-two parcels bearing postage purchased from the CARDINGMASTER Postage Reseller 1 account and bearing a return address known to be used by CARDINGMASTER.  On January 27, 2021, Ombisi also mailed a parcel to undercover agents who made a purchase from CARDINGMASTER.

Considering the entirety of the Affidavit, it does contain a description of the apparent drug trafficking activities Ombisi was believed to be conducting on the same dates as he was going to and from Subject Premises 3.  Additionally, Ombisi has not argued that these allegations repeatedly tying him to Subject Premises 3 on dates when he is believed to be shipping USPS packages for CARDINGMASTER are insufficient to establish the requisite nexus such that the issuing magistrate judge acted arbitrarily.  Accordingly, it is RECOMMENDED that the search warrant for the search thereof was supported by probable cause and not violative of the Fourth Amendment.

### c.    *Subject Premises 4*

With respect to Subject Premises 4, Ombisi argues that there is no nexus between Subject Premises 4 and any evidence sought because the affiant did not indicate that "any illegal activity whatsoever was associated with the storage unit in question," that there was "no allegation that drugs were recovered from the unit," that there was "no allegation that any drug transactions took place at the unit," and that there is "nothing illegal about using the U.S. mail to ship parcels."

30

Ombisi does not cite any authority that requires an affidavit to contain any of these specific allegations. Additionally, he does not cite any authority for the proposition that the evidence that is contained in this Affidavit was insufficient for the issuing magistrate judge to have found that a nexus existed between Subject Premises 4 and the evidence sought.

Considering the entirety of the Affidavit, the storage unit was paid for on two occasions from an account associated with CARDINGMASTER. Subject Premises 4 was accessed on three dates where evidence demonstrates that Ombisi later proceeded to the Alameda Station post office and mailed twenty-five parcels associated with CARDINGMASTER. On another occasion, Ombisi is seen on surveillance footage exiting Subject Premises 4 with a USPS mailing box.

Absent any specific argument as to why these connections between Subject Premises 4 and Ombisi's suspected drug trafficking activities are insufficient for the issuing magistrate judge to have found that that the requisite nexus existed, it is RECOMMENDED that the search warrant for the search thereof was supported by probable cause and not violative of the Fourth Amendment.

### d. Subject Premises 6

With respect to Subject Premises 6, Ombisi relies upon Russell's general argument that a nexus must exist between the place searched and the evidence sought; however, Ombisi does not articulate either why he believes that no such nexus existed with Subject Premises 6 or why the issuing magistrate judge's finding that it did was arbitrary.

After reviewing the Affidavit, it sets forth that Subject Premises 6 was Ombisi's final stop before going to the Alameda Station post office and mailing a total of forty-six parcels

associated with CARDINGMASTER.  Of all of the locations, including Subject Premises 1, 3, and 4, Ombisi spent the most time at this location before continuing to mail the packages. Absent any specific argument as to why these connections between Subject Premises 6 and Ombisi's suspected drug trafficking activities are insufficient for the issuing magistrate judge to have found that that the requisite nexus existed, it is RECOMMENDED that the search warrant for the search thereof was supported by probable cause and not violative of the Fourth Amendment.

### ii.    *Russell's Connections to Criminal Activity*

With respect to the search warrants issued to search premises associated with Russell, before proceeding to the question of whether the requisite nexus existed between the places to be searched and the evidence sought, Russell argues that the Affidavit fails to even establish probable cause that he was involved in criminal activity.

Russell's position is that the Affidavit contains allegations tying Ombisi to criminal activity but that its allegations attempting to connect him to Ombisi's criminal activity are insufficient.  (*See* D.E. #81 at PageID 341-344; D.E. #83 at PageID 421-24; D.E. #85 at PageID 486-88).  Specifically, Russell argues that the Affidavit only alleges as follows: (1) that he and Ombisi had a conversation in March 2020 regarding obtaining boxes for "100+ orders" and creating a business name and USPS login; (2) that he advised Ombisi that they should go to the post office at night to obtain the boxes; (3) that he possessed a photograph with the text "Empire Market 2019" and a mnemonic phrase that would allow access to an Empire Market account; (4) the he and Ombisi had a conversation in September 2020 regarding Wickr, NordVPN, and a third-party's request that Ombisi create a new bitcoin account because he had not been able to

make deposits; and (5) that peer-to-peer cryptocurrency records show that an account linked to Ombisi was accessed on five occasions from an IP address servicing Subject Premises 7, which agents believed to be Russell's residence.

Russell asserts that the Affidavit does not provide any specific information indicating that he possessed drugs, helped Ombisi ship drugs, or knew that Ombisi was involved in shipping drugs. Russell additionally avers that the Affidavit does not contain any information suggesting that he had control over the CARDINGMASTER alias or accounts that Ombisi is alleged to have used to distribute controlled substances via the Darknet and Wickr.

Further, Russell argues that there is nothing illegal about using USPS to ship orders or advising another person on the logistics of doing so. He argues that the Affidavit does not include any detail as to the contents of the "100+ orders" or any other information about the business for which he and Ombisi were creating a name. He argues that Empire Market sells legitimate and legal products and that the Affidavit contains no evidence that he ever accessed Empire Market, let alone did so in furtherance of the alleged offenses or other criminal activity. He argues that there is nothing illegal or suspicious about using cryptocurrency and cites internet sources explaining how it is used by major corporations, multinational firms, and some governments. Finally, he argues that the Affidavit contains no information as to why the third-party may want Ombisi to create a bitcoin account or the nature of the deposits he wished to make.

The Government contends that these allegations do establish probable cause that Russell was working with Ombisi to distribute methamphetamine through the Darknet and to launder the proceeds of their criminal activity. The Government's position is supported by Special Agent

Cox's opinion, as set forth in the Affidavit, that Russell appeared to be coordinating with Ombisi

to create USPS accounts with fictitious names, advising him to go to the post office at night,

presumably to avoid detection by law enforcement, and passing on the message that Ombisi

needed to create a bitcoin account for the purposes of converting drug proceeds in the form of

cryptocurrency into fiat currency.

Upon review, while Russell has clearly articulated the factual basis for why he believes

the Affidavit did not establish probable cause that he was associated with criminal activity, and

while he offers lawful explanations for the evidence in the Affidavit, he has not cited any

authority supporting his position that the issuing magistrate acted arbitrarily in reaching a

different conclusion.[10]  The Sixth Circuit has held that, "in order to undermine the magistrate's

finding, the likelihood of an innocent explanation must (at the very least) be *greater* than the

likelihood of a guilty one." *United States v. Terry*, 522 F.3d 645, 650 (6th Cir. 2008); *see also*

*United States v. Bryshaun Dodds*, No. 3:18-cr-730, 2021 WL 698657, at *3 (N.D. Ohio Feb. 23,

---

[10]   The only case cited by Russell in his argument that the Affidavit did not establish probable cause that
he was associated with criminal activity is *United States v. Brooks*, 594 F.3d 488 (6th Cir. 2010), for the
proposition that the screenshot containing the text "Empire Market 2019" and the mnemonic password
was "stale" and could not be used to support the probable cause determination. *Id.* at 493.

It is true that, in the "drug trade," information generally becomes stale quickly because "drugs are usually
sold and consumed in a prompt fashion." *Id.* (quoting *United States v. Frechette*, 583 F.3d 374, 378 (6th
Cir. 2009)).  However, "whether the information is stale 'depends upon the inherent nature of the crime,'"
*Brooks*, 594 F.3d at 493 (quoting *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)).  One factor
is whether the crime is believed to be an ongoing conspiracy. *Brooks*, 594 F.3d at 493 (quoting *United
States v. Hammond*, 351 F.3d 765, 771-72 (6th Cir. 2003)).  "Evidence of ongoing criminal activity will
generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6t Cir. 2001) (citation
omitted).

Here, CARDINGMASTER is believed to have been selling methamphetamine on Empire Market since
2019 and was continuing to do so up until days before the Affidavit was presented to the magistrate
judge.  Further, there is no evidence that this mnemonic password is no longer valid.  Additionally, unlike
illegal drugs themselves or information regarding where they are being kept, the password is not a
consumable product that is meant to be sold and consumed.  Thus, it is RECOMMENDED that there is
no basis for this Court to conclude that the magistrate judge improperly relied upon this information in
making the probable cause determination.

2021) (reasoning that "[t]he fact that these incidents individually may be susceptible to an innocent explanation does not undermine the . . . court's probable cause determination").

Here, Russell has conversed with Ombisi about large numbers of USPS shipments, the encryption application Wickr, NordVPN, and cryptocurrency. These are essential elements of CARDINGMASTER's operation and are the very tools with which Ombisi is alleged to have used to distribute methamphetamine under that moniker. Russell was then found to have a mnemonic access code to an Empire Market account from 2019 when CARDINGMASTER was known to be selling methamphetamine on Empire Market. And, perhaps the most significant, a cryptocurrency account registered in Ombisi's name was accessed five times from an IP address servicing what is believed to be Russell's residence. Therefore, based on the totality of the circumstances, it is RECOMMENDED that the magistrate judge did not arbitrarily determine that there is probable cause that Russell is linked to Ombisi's criminal activity and the CARDINGMASTER operation.

### iii.    *Subject Premises Associated with Russell*

#### a.    *Subject Premises 5*

With respect to Subject Premises 5, Russell argues that the Affidavit fails to establish the requisite nexus because it does not include even a "remote link" suggesting that he used this storage unit for any unlawful reason. Specifically, the Affidavit only sets forth that Russell went to his storage unit twice. On one of these occasions, Russell took two boxes to this storage unit after closing another unit.

The Government contends that Russell's use of (and recent access of) his storage unit—particularly one in the same storage facility as Ombisi, should be viewed in a different light

given Russell's ties to Ombisi and the evidence that Ombisi is accessing his storage unit on dates when he later made shipments for CARDINGMASTER. However, absent any evidence suggesting that Russell is using this storage unit in a similar manner rather than simply storing other personal belongings, the likelihood of an innocent explanation remains greater than the likelihood of a guilty one. *See Terry*, 522 F.3d at 650.

The Government further asserts that Russell's cash payments raise suspicion that he may be using it to store evidence of criminal activity. In the Affidavit, Special Agent Cox opined that he knows that "individuals involved in this activity will utilize cash payments for their operations . . . in order to conceal the existence of these facilities from law enforcement." Further, Special Agent Cox explains that "these individuals often handle large sums of cash as proceeds of illegal drug trafficking activities and will chose to utilize these proceeds in the form of cash rather than deposit these funds into a bank account."

Even so, here, there is no direct evidence that Russell often handles large sums of cash that he may choose to spend rather than deposit. Although the Affidavit does set forth that Special Agent Cox believes certain of Russell's financial transactions are suspicious, including writing checks to himself in amounts ranging from $4,000.00 to $9,850.00, it also sets forth that these amounts were deposited into a bank account.

Additionally, while it could be true that Russell paid in cash to conceal the existence of his storage unit, any potentially deceptive motivations must be weighed against the fact that he provided his name, driver's license, phone number, email address, a physical address that he has used in public filings, and his relative's name as an emergency contact. Given this context, the

likelihood of an innocent explanation for renting a storage unit continues to remain greater than the likelihood of a guilty one.

Ultimately, however, even if the search warrant for Subject Premises 5 were to be found lacking in probable cause, the Court does not believe there is any basis to conclude that the officers who executed it were not acting in objectively reasonable reliance upon it.  As already discussed, *supra*, Section II.A, it is RECOMMENDED that the affiant did not intentionally, knowingly, or recklessly include false information.  The thirty-eight-page Affidavit, which meticulously details the evidence obtained thus far against Ombisi and Russell, is not so lacking in any indicia of probable cause that reliable upon it is objectively unreasonable.  Likewise, the magistrate's determination, which was made after being presented with extensive evidence, does not appear to simply be a rubber stamp on police activity.  Finally, the search warrant itself is not so facially deficient that it should be presumed to be invalid.  (*See* D.E. #86 at PageID 494-503). Accordingly, it is RECOMMENDED that there is no basis for suppression of the evidence obtained from the search of Subject Premises 5.

### b.  *Subject Premises 7*

With respect to Subject Premises 7, the Affidavit relies upon GPS and cellular tracking data to suggest that Ombisi met with Russell on January 2, 2021 near—but not inside—Subject Premises 7 after Ombisi was tracked to be in the vicinity of a bank.  Specifically, the Affidavit sets forth that Russell left his residence, was tracked to be within approximately 121 meters of Ombisi, and then returned to his residence.  There is no other evidence supporting the supposition that they met, nor is there any evidence that they did so to engage in conduct in furtherance of criminal activity.  Once again, absent any further information, the likelihood of an

innocent explanation for any possible meeting that may have happened remains greater than the likelihood of a guilty one. *See Terry*, 522 F.3d at 650.

To justify the issuing judge's probable-cause determination, the Government relies upon a line of cases within the Sixth Circuit that considers when a person known to be engaging in drug trafficking should be presumed to store evidence thereof in his home. These cases generally involve very significant ties between the individual and drug trafficking. *See, e.g. United States v. Brown*, 828 F.3d 375, n.2 (6th Cir. 2016) (explaining that it is "well established" that, if an affidavit contains evidence that "defendants were major players in a large, ongoing drug trafficking operation," the Sixth Circuit has "found the nexus sufficient even though the affidavit did not contain facts showing that the residence had been used in drug trafficking"); *United States v. Gunter*, 551 F.3d 472, 476–77 (6th Cir. 2009) (permitting the search of the residence when the evidence showed that the individual was repeatedly engaging in purchases of one to four kilograms of cocaine); *United States v. Kenny*, 505 F.3d 458, 461–62 (6th Cir. 2007) (permitting the search of a residence where the individual was located at a methamphetamine lab and where he was identified by another individual as the person who "cooks" the methamphetamine); *United States v. Miggins*, 302 F.3d 384, 388 (6th Cir. 2002) (permitting a search of the residence when both residents accepted a controlled delivery of one kilogram of cocaine and one resident was believed to have numerous cocaine-related convictions).

Relying upon *United States v. Reed*, 993 F.3d 441 (6th Cir. 2021), the Government asserts that evidence may also be presumed to be found in a suspected drug dealer's home if the suspected drug trafficking is "ongoing" at the time the search warrant is sought. *Id*. at 448-49 (citing cases). These courts have focused on the recency and reliability of the evidence of

ongoing drug trafficking as well as other factors. *Id.* Yet the Sixth Circuit has cautioned that these determinations are a "struggle" as they often "sit on the hazy constitutional border between a sufficient nexus and an insufficient hunch." *Id.* at 449-50. Thus, the *Reed* court and others have determined that, rather than enter those "frothy waters," *see United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018), it is more prudent to resolve the suppression question on the "narrower remedy ground" of whether the *Leon* good-faith exception applies. *Id.*; *Reed*, 993 F.3d at 449-54.

For the reasons set forth, *supra*, Section II.B.iii.a, it is RECOMMENDED that officers were acting in objectively reasonable reliance upon the search warrant when executing it. As already discussed, *supra*, Section II.A, it does not appear that the affiant intentionally, knowingly, or recklessly omitted the ping-radius information that was included in the Geolocation Affidavit. The lengthy Affidavit meticulously details the evidence obtained thus far against Ombisi and Russell such that it is not so lacking in any indicia of probable cause that reliance upon it is objectively unreasonable. Likewise, the magistrate's determination, which was made after being presented with extensive evidence, does not appear to simply be a rubber stamp on police activity. Finally, the search warrant itself is not so facially deficient that it should be presumed to be invalid. (*See* D.E. #82 at PageID 352-61). Accordingly, it is RECOMMENDED that there is no basis for suppression of the evidence obtained from the search of Subject Premises 7.

### c.   *Subject Premises 8*

With respect to Subject Premises 8, the Affidavit sets forth that Russell rented a safety deposit box that was larger than the complimentary option, that he accessed it on February 5,

2020, and that cellular data demonstrates that he was in the vicinity of it on thirteen occasions between July 9, 2020 and January 22, 2021.

The Affidavit contains Special Agent Cox's explanation that this is not the typical size safety deposit box used to store smaller items such as passports and birth certificates. Special Agent Cox posits that one reason a larger box may have been needed is that drug traffickers operating in cryptocurrency often handle large amounts of fiat currency and other valuable items that they have received from illegal drug sales. He further explains that drug traffickers operating in cryptocurrency and those laundering money using cryptocurrency often use a number of digital devices, including phones and computers, and need to store items such as USB drives that contain the valuable digital access information in a place that is "separate and away from their routine drug operations such that it is safe from theft and/or law enforcement and compartmentalized." Yet, without more than the fact that Russell rents a larger box and has accessed it once, the likelihood of an innocent explanation for renting it is greater than the likelihood of a guilty one.

The Affidavit then sets forth that there have been sizeable and suspicious money transfers in the Regions Bank accounts linked to Russell's safety deposit box. However, while that may point to whether Russell is engaging in criminal activity generally, it does not assist in establishing the nexus between any evidence of such criminal activity and what is being stored inside Subject Premises 8.

As discussed, *supra*, Sections II.B.iii.a and II.B.iii.b with respect to Subject Premises 5 and 7, rather than determining whether the issuing magistrate judge's determination was arbitrary, the suppression question can be resolved by considering the *Leon* good-faith exception.

There is no allegation that the affiant intentionally, knowingly, or recklessly included false information.  The lengthy Affidavit meticulously details the evidence obtained thus far against Ombisi and Russell such that it is not so lacking in any indicia of probable cause that reliable upon it is objectively unreasonable.  Likewise, the magistrate's determination, which was made after being presented with extensive evidence, does not appear to simply be a rubber stamp on police activity.  Finally, the search warrant itself is not so facially deficient that it should be presumed to be invalid.  (*See* D.E. #84 at PageID 428-437).  Accordingly, it is RECOMMENDED that there is no basis for the suppression of the evidence obtained from a search of Subject Premises 8.

### III.    Conclusion

For the reasons set forth herein, Russell's requests for hearings pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), which are raised in his Motion to Suppress Evidence from Subject Premises 5 (D.E. #85) and Subject Premises 7 (D.E. #81) are DENIED.

It is RECOMMENDED that Russell's Motions to Suppress Evidence from Subject Premises 5 (D.E. #85), Subject Premises 7 (D.E. #81), and Subject Premises 8 (D.E. #83) be DENIED.  It is further RECOMMENDED that Ombisi's Motions to Suppress Evidence from Subject Premises 1 (D.E. #99), Subject Premises 3 (D.E. #99), Subject Premises 4 (D.E. #100), and Subject Premises 6 (D.E. #99) be DENIED.


**SIGNED** this 22nd day of April, 2022.

s/ Charmiane G. Claxton<br>
CHARMIANE G. CLAXTON<br>
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**