IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.                 Case 2:21-cr-20011-MSN

**KEVIN OLANDO OMBISI,**

    Defendant.

---

**REPORT AND RECOMMENDATION ON DEFENDANT KEVIN OLANDO OMBISI'S MOTION TO SUPPRESS EVIDENCE OBTAINED PURSUANT TO SEARCH AND SEIZURE WARRANT FOR PRIORITY MAIL PARCEL 9405511699000517811079**

---

Before the Court is Defendant Kevin Olando Ombisi's Motion to Suppress Evidence Obtained Pursuant to Search and Seizure Warrant for Priority Mail Parcel 9405511699000517811079 (the "Fleetwood Parcel") (Docket Entry ("D.E.") #110, #111). The instant motion has been referred to the United States Magistrate Judge for Report and Recommendation. (D.E. #112). For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

### I. Background

#### A. *Indictment and Superseding Indictment*

On February 2, 2021, a criminal complaint was issued charging Ombisi and Russell with drug-related offenses. (D.E. #1). On February 25, 2021, a grand jury of this Court returned a

ten-count indictment ("Indictment") against Ombisi and Russell. (D.E. #8, #9). On October 28, 2021, a grand jury of this Court returned a ten-count superseding indictment ("Superseding Indictment") against Russell, Ombisi, and a third co-defendant—Winrose Wanjiru Ndichu, a/k/a "Rose," a/k/a "Shiru," a/k/a "Queen Shi" ("Ndichu"). (D.E. #53, #54, #56, #57).

The Superseding Indictment charges that Ombisi and Russell "participated in Darknet controlled-substances trafficking activities using the moniker CARDINGMASTER." (*Id*. ¶ 1). It alleges that, under CARDINGMASTER, Ombisi and Russell "conspired and attempted to, and did unlawfully distribute the Schedule II controlled substance methamphetamine, which was falsely represented to be Adderall, through the mail to be delivered by the Postal Service, in the Western District of Tennessee, and elsewhere, in exchange for Bitcoin cryptocurrency." (*Id*.) It further alleges that Ombisi and Russell unlawfully enriched themselves through the unlawful distribution of controlled substances, shielded their identities through the use of the CARDINGMASTER moniker and other business entities, and concealed the receipt of proceeds through the use of pseudo-anonymous Bitcoin cryptocurrency, cash, and various business and personal accounts. (*Id*. ¶¶ 2-3).

The Superseding Indictment charges Ombisi with the following: conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 (Count 1); unlawful distribution of controlled substances in violation of 21 U.S.C. § 841 (Counts 2-4); attempted unlawful distribution of controlled substances in violation of 21 U.S.C. § 846 (Count 5); sale of counterfeit drugs in violation of 21 U.S.C. § 331(i)(3) and § 333(b)(8) (Count 6); conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1) & (h) (Count 7); and, mail fraud in violation of 18 U.S.C. § 1341 (Counts 8-10). It additionally charges Russell with conspiracy to

distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) (Count 1) and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1) & (h) (Count 7).

### B. Search Warrant Affidavit for the Fleetwood Parcel

On July 13, 2020, an application for a search warrant and an Affidavit in Support of Search Warrant (the "Affidavit") was presented to the issuing magistrate. (D.E. #111 at PageID 1560-1569). The Affidavit identifies the affiant as United States Postal Inspector Joseph MacDougall ("Inspector MacDougall"). (*Id*. at PageID 1561, ¶ 1). A search warrant designated 4:20mj1242 was subsequently issued by the United States District Court for the Southern District of Texas. (D.E. #111 at PageID 1572-75).

Inspector MacDougall states that he has been employed by the United States Postal Inspection Service ("USPIS") for eight years, during which time he has (1) received training in investigating the use of parcel-delivery services to transport controlled substances or the proceeds of narcotics sales, (2) participated in hundreds of controlled-substance investigations, and (3) intercepted or helped intercept in excess of one thousand parcels containing controlled substances or the proceeds of narcotics sales being transported through parcel-delivery services. (*Id*. at PageID 1561, ¶ 1) Inspector MacDougall states that he also relies upon the training and experience of the other members of the USPIS Houston Division Narcotics Team who have intercepted in excess of five thousand parcels containing controlled substances or the proceeds of controlled substance sales within the previous two years. (*Id*. at PageID 1561-62, ¶ 2).

Inspector MacDougall states that the USPIS is aware that U.S. Postal Service Express Mail ("Express Mail") and U.S. Postal Service Priority Mail ("Priority Mail") are frequently used by drug traffickers. (*Id*. at PageID 1562, ¶ 3). In an effort to combat this, USPIS has

established interdiction programs in cities throughout the United States that have been identified as known sources of controlled substances. (*Id*. at PageID 1562-63, ¶ 4). As part of this effort, USPIS has identified a list of characteristics found on parcels that contain controlled substances or the proceeds associated therewith. (*Id*.)

USPIS believes that their analyses show that, if two are more of their identified characteristics are found on a mailing, there is a "high probability" that it will contain controlled substances or the proceeds of controlled substances sales. (*Id*.) These characteristics include, but are not limited to, the following: the package is mailed from or addressed to a "narcotic source city"; the package has a fictitious return address; the package addressee name is unknown at the destination address; the package's sender's name is unknown at the return address; the package has handwritten address information; the package is mailed to or from a Commercial Mail Receiving Agency; the package is addressed from an individual to an individual; the phone numbers listed on the package are not related to the listed parties or are not in service; the packages are wrapped and/or heavily taped; the frequency of the mailings is inconsistent with normal use absent a business relationship; and, the ZIP Code from which the package is mailed is different than the ZIP Code used in the return address. (*Id*. at PageID 1563, ¶ 4).

The Affidavit then describes the Fleetwood Parcel as being a small, flat-rate, priority mailing box that was sent from D&B Accessories, 20501 Katy Fwy, 1st Floor, Ste 100E, Katy, TX 77449 (the "D&B Accessories Address"). (*Id*. at PageID 1563-64, ¶ 6). The Fleetwood Parcel was addressed to Mitch Chalk at a Kansas, City, Missouri address. (*Id*.) The Fleetwood Parcel was postmarked on July 9, 2020, and the cost of the postage was $6.93. (*Id*.)

The Affidavit then sets forth the broader context in which this package was suspected to contain evidence of illegal drug trafficking activities. USPIS, the Food and Drug Administration's Office of Criminal Investigations ("FDA-OCI"), the Drug Enforcement Administration ("DEA") and Homeland Security Investigations ("HSI") were investigating the distribution of adulterated and counterfeit amphetamine-based prescription drugs on a Darknet Marketplace[1] known as Empire Market and via the encrypted chat application Wickr.[2] (*Id*. at PageID 1564, ¶ 7). On seven occasions between January 2020 and May 2020, undercover agents made purchases of what was listed as the prescription drug Adderall, without a prescription, from CARDINGMASTER in exchange for Bitcoin cryptocurrency. (*Id*. at PageID 1564-65, ¶¶ 8, 10). On each occasion, a parcel was delivered to the undercover address with contents consistent with the items purchased (*Id*. at PageID 1565, ¶ 10); however, preliminary laboratory testing conducted by the DEA indicated that the product did not contain the active pharmaceutical ingredient in Adderall but instead contained methamphetamine, a Schedule II controlled substance. (*Id*. ¶ 9).

The parcels that undercover agents received containing their orders from CARDINGMASTER all had pre-printed postage purchased through a postage reseller ("Postage Reseller 1") operating under contract with USPS. (*Id*. at PageID 1565, ¶ 11). A review of records obtained from Postage Reseller 1 showed that the account was under the name Frederick

---

[1] The Affidavit defines a "Darknet Marketplace" as a commercial website that operates on darknets, which are "networks of computers that utilize some of the same architecture of the Internet, but which provide greater anonymity and the obfuscation of user identities." (*Id*. at PageID 1564, n.1). It further explains that, "[b]ecause of this anonymity, Darknet Marketplaces are commonly used to facilitate illegal transactions involving, among other things, drugs." (*Id*.)

[2] The Affidavit explains that Wickr is "an encrypted communication application that allows individuals to communicate via text and voice." (*Id*. at PageID 1564, n.2). Additionally, "Wickr is used by individuals involved in the trafficking of counterfeit drugs because of the ability for senders of messages to set a self-destruct time for messages, as well as security features which notify senders of messages when parties to the conversation take a screenshot of messages." (*Id*.)

Bailey, that the email addresses listed were DNBACCESSORIESS@GMAIL.COM and DNBACCESSORIES@OUTLOOK.COM, and that the addresses listed were in Katy, Texas and San Antonio, Texas. (*Id*. at PageID 1566, ¶ 12). It also showed that the Postage Reseller 1 account used to purchase all of the postage found on the parcels shipped to undercover agents was assigned meter # 10857087 (the "Postage Meter"). (*Id*. at PageID 1566, ¶ 13).

A review of records associated with the Postage Meter showed that approximately 3,001 mailings had been sent using its postage. (*Id*. ¶ 13). Twenty-two of these mailings were sent using postage for a Priority Mail Medium Flat Rate Box. (*Id*. ¶ 13a). Twenty of these contained the D&B Accessories Address as the return address. (*Id*. ¶ 14). Of these twenty, twelve were addressed to Ombisi at a P.O. Box at the North Broadway Post Office in San Antonio, Texas (the "P.O. Box"), and eight were addressed to Ombisi at a UPS Store Mailbox in San Antonio Texas (the "UPS Mailbox"). (*Id*. ¶¶ 14, 17-19). Inspector MacDougall summarizes that "this evidence demonstrates that the vast majority of the larger shipments are being sent from D&B Accessories, LLC in Katy, Texas to Kevin Ombisi in San Antonio, Texas." (*Id*. ¶ 15). He also reiterates that this connects Ombisi as being "the recipient of at least 20 pieces of mail bearing USPS postage purchased by an account known to be used to purchase postage for the distribution of illegal drugs," some of which were delivered to Inspector MacDougall as part of the undercover investigation. (*Id*. at PageID 1567, ¶ 20).

The remaining 2,979 mailings traced to the Postage Meter were sent using postage for Priority Mail Small Flat Rate Boxes and Priority Mail Legal Flat Rate Envelopes. (*Id*. at PageID 1566, ¶ 13b). Inspector MacDougall explains that this appears to show that "whomever receives

the packages in San Antonio may be dividing the larger Medium Box shipments into smaller packages to send to the purchasers." (*Id*. ¶ 16).

Inspectors then discovered that Ombisi was the registered owner of a Volkswagen Jetta and obtained his license plate information. (*Id*. at PageID 1567, ¶ 21). They also became aware that this vehicle had recently been parked at 24929 Katy Ranch Road, Katy, Texas 77494 (the "Katy Ranch Road Address"). (*Id*.) On July 9, 2020, with the assistance of the Katy Police Department, USPIS conducted surveillance at the Katy Ranch Road Address and observed a Jetta matching Ombisi's license tag information. (*Id*. ¶ 22). Inspector MacDougal also observed an individual he believed to be Ombisi based upon his driver's license photograph exit one of the apartment buildings carrying several bags, including a white paper shopping bag. (*Id*. at PageID 1567-68, ¶ 22). Ombisi placed the bags and a backpack inside the trunk of the Jetta and departed the premises in his vehicle. (*Id*. at PageID 1567-68, ¶¶ 22-23).

Approximately forty-two minutes later, Ombisi arrived at the Fleetwood Post Office located in Houston, Texas. (*Id*. at PageID 1568, ¶ 23). Inspector MacDougall obtained CCTV footage which showed Ombisi walk into the Fleetwood Post Office "carrying a large white paper shopping bag and dump the contents, which appeared to be numerous small flat-rate priority mail boxes, into the lobby parcel drop." (*Id*.) Inspector MacDougall pulled the bin containing the outbound mail from the lobby drop box and found eleven small flat-rate boxes bearing the D&B Accessories Address. (*Id*.)

Inspector MacDougall retrieved the Fleetwood Parcel and noted that it was shipped using Postage Reseller 1 and was consistent with previous undercover purchases from Ombisi that contained counterfeit pills. (*Id*. at PageID 1568, ¶ 24). There were no other parcels in the

outbound bin using small, flat-rate parcels such as those that video footage showed Ombisi depositing. (*Id*.) Inspector MacDougall also reviewed postal business records and revealed that numerous prior shipments had been made from D&B Accessories, LLC to Mitch Chalk. (*Id*.)

On July 10, 2020, the Fleetwood Parcel was exposed to a narcotic detection dog named Rex at the Missouri City Police Department ("MCPD"). (*Id*. ¶ 25). Rex is handled by Officer Brian Motto of MCPD. (*Id*.) Officer Motto and Rex "are certified as a team in the detection of controlled substances," and Rex has "numerous hours of training in the detection of controlled substances," including methamphetamine, ecstasy, and heroin. (*Id*.) Additionally, Rex has "successfully alerted on concealed controlled substances in numerous prior cases, which has led to the arrest of numerous suspects for drug law violations." (*Id*.)

The Affidavit states that Rex first conducted an "off leash sweep" of the loading dock behind MCPD's building and did not alert to any odors in the area. (*Id*. at PageID 1568-69, ¶ 25). The Fleetwood Parcel was then placed inside the MCPD building's loading dock. (*Id*. at PageID 1569, ¶ 25). After the parcel was relocated, Rex conducted a second off-leash search of the area and indicated a positive alert to the presence of a "controlled substance scent" inside the Fleetwood Parcel. (*Id*.)

## II. Analysis

### A. *Whether Ombisi is entitled to a Franks hearing*

As a threshold issue, Ombisi requests that an evidentiary hearing be held pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Court began with the premise that an affidavit supporting a search warrant is presumed to be valid. *Id*. at 171. Generally, the "review

of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit." *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (citing *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009)).  However, if the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by in the affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. *Franks*, 438 U.S. at 155-56.  The challenger's attack must be more than conclusory, and it should point out specifically the portion of the warrant affidavit that is claimed to be false. *Id*. at 171.  Allegations of negligence or innocent mistake are insufficient to warrant a *Franks* hearing. *Id*.

Ombisi argues that a *Franks* hearing is necessary because the Affidavit contained material omissions and was overly broad such that it that misrepresented the likelihood that illegal drugs would be found inside the Fleetwood parcel.  Specifically, Ombisi asserts that, while Inspector MacDougall detailed that at least two suspicious characteristics are commonly found on parcels containing evidence relating to illegal controlled substance sales, the Affidavit only states that one of these was found on the Fleetwood Parcel—namely, that it was mailed from a different Zip Code than was listed on the return address.  Ombisi states that there are many explanations for this to be the case and that it is not indicative of a package containing narcotics.

While Ombisi's summarization of which characteristics were found on the Fleetwood Parcel is correct, and while it is also correct that the Fleetwood Parcel does not meet the one standard set forth in the Affidavit for USPIS to believe there was a "high probability" that it

contained narcotics or evidence relating thereto, this does not entitle him to a *Franks* hearing. Both the list of characteristics and the description of the Fleetwood Parcel are contained within the four corners of the Affidavit, and there is no statement therein that is alleged to be false. Accordingly, Ombisi's request for an evidentiary hearing pursuant to *Franks* is DENIED.

### B. Whether the Affidavit establishes probable cause to search the Fleetwood Parcel

Next, Ombisi asserts that the Affidavit did not establish that probable cause existed to search the Fleetwood Parcel. The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. When presented with an application for a search warrant, the "task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted); *see also United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citation omitted) (explaining that "[s]earch warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny").

"The critical element of a reasonable search is . . . that there is reasonable cause to believe that the specific things to be searched for and seized are located" at the place to be searched. *Zurcher v. The Stanford Daily*, 436 U.S. 547, 556 (1978) (internal quotation marks omitted). This is typically referred to as the "nexus" between the place to be searched and the evidence desired to be found. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2003).

Although reasonable minds may frequently differ on the question of whether the affidavit establishes probable cause, reviewing courts should afford the issuing magistrate's determination "great deference," *United States v. Leon*, 468 U.S. 897, 914 (1984) (citation omitted), "an issuing magistrate's decision should only be reversed if it was arbitrarily exercised," *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (citing *United States v. Swihart*, 554 F.2d 264, 270 (6th Cir. 1977)).

Ombisi raises three specific challenges: (1) that the Fleetwood Parcel did not have a "high probability" of containing evidence of drug trafficking activity because it did not meet two of the USPIS criteria; (2) that the Affidavit failed to establish the reliability of the drug-detection dog; and, (3) that the method used to present the drug-detection dog with the Fleetwood Parcel was improper.

As to the first issue, while Ombisi is correct that the Affidavit does not set forth that the Fleetwood Parcel matches two of the listed "high probability" criteria, the Affidavit states that this list is not exhaustive. Further, the issuing magistrate was not required to find that the Fleetwood Parcel met two of these criteria to issue the search warrant. Thus, there is no basis from this to conclude that the issuing magistrate could not have found probable cause by weighing the totality of the circumstances contained within the Affidavit.

As to the second issue, the Sixth Circuit has held that, for a drug-detection dog's reaction to support a determination of probable cause, the training and reliability of the dog must be established. *United States v. Berry*, 90 F.3d 148, 153 (6th Cir. 1996) (citing *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)). However, this is not a high bar. The *Berry* court found that the evidence contained in the affidavit was sufficient to establish the training and reliability

11

of the drug-detecting dog because it referred to him as such and stated that he was trained and qualified to conduct narcotics investigations. *Berry*, 90 F.3d at 153. It further stated that an "affidavit need not describe the particulars of the dog's training"; instead, "the affidavit's accounting of the dog sniff indicating the presence of controlled substances and its references to the dog's training in narcotics investigations was sufficient to establish the dog's training and reliability." *Id*. (citing cases).

Here, the Affidavit contains various statements as to the drug-detection dog's reliability. It states that Rex and Officer Motto are "certified as a team in the detection of controlled substances," that Rex has "numerous hours of training in the detection of controlled substances," and that Rex "has successfully alerted on concealed controlled substances in numerous prior cases, which has led to the arrest of numerous suspects for drug law violations." The issuing magistrate was able to consider this evidence as he saw fit in making his probable cause determination, and there is no basis from which the reviewing court could determine that the decision was made arbitrarily.

As to the third issue, Ombisi cites three cases involving drug-detection dogs where the parcels were presented in a line-up. *See United States v. Robinson*, 390 F.3d 853, 861 (6th Cir. 2004); *United States v. Ligon*, 861 Fed. Appx. 612, 615 (6th Cir. 2021); *United States v. Bryan Caldwell*, No. 99-5464, 2000 WL 1277011, at *2 (6th Cir. Aug. 30, 2000). None of these cases require such a presentation for a drug-detection dog's alert to be considered as reliable. Thus, whatever weight, if any, the issuing judge chose to attribute to the manner in which the parcel was presented to the dog was within his discretion, and there is not basis for this Court to determine that his decision was made arbitrarily.

### III. Conclusion

For the reasons set forth herein, it is RECOMMENDED that the search of the Fleetwood Parcel did not violate the Fourth Amendment and that Ombisi's Motion to Suppress Evidence obtained from the Fleetwood Parcel (D.E. #110) be DENIED.

**SIGNED** this 22nd day of April, 2022.

                                        s/ Charmiane G. Claxton
                                        CHARMIANE G. CLAXTON
                                        UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**